The next case on the call of the docket is agenda number six, case number 131565, People v. McCoy. Counsel for the appellant, are you ready to proceed? Please proceed. Good morning, may it please the court, I'm Deborah Lobey from the Exoneration Project on behalf of the appellant, Michael McCoy. This case presents three independent and interrelated manifest errors in a third stage adjudication of a post-conviction actual innocence claim. The issues raised are how to understand the conclusiveness requirement for this claim and the requirements that the court view the evidence collectively and objectively. I would like to focus this morning on the novel issue around the meaning of conclusiveness. Specifically, that conclusiveness for an actual innocence claim can be proven by comprehensively disproving the entirety of the prosecution. There were only two types of evidence that were presented below to inculpate Mr. McCoy. Before you continue with conclusiveness, what is the standard of review here? How are we to look at this? It is manifest error, and we are arguing three manifest errors. The conclusiveness standard was misunderstood, the court failed to view the evidence objectively, and the court siloed it impermissibly. However, upon adjudicating that, this court does have two options. One is to remand for a new post-conviction hearing, and the other is to remand for a new trial. And I do believe that depending on which issue it's adjudicating, there's a different answer to that question. With the issue that I'd like to argue this morning about the conclusiveness of the evidence, I believe if the court agrees with me, the remedy should be to remand for a new trial. But the standard of review is manifest error. So there were two types of evidence that were presented at trial. There was the supposed blood on the shoe and the eyewitness identifications. The seen fingerprints, the palm print, the shoe print, none of that matched Mr. McCoy. There was no DNA evidence, no confession, no proceeds, flight, weapons, nothing else except for these two things. And both of these pieces of evidence have been comprehensively disproven on post-conviction. So the modern serology testing has shown that there was no blood found on the shoe. Those are the findings. And if there were a new trial, the state would not be able to present evidence that there was some sort of forensic connection between Mr. McCoy and the crime because there is none. There is no evidence supporting that. And that was the centerpiece of the case as the state argued it in the trial court. Their closing argument centered around blood on the shoe, blood dripping from the walls and seeing the shoe went back to the jury. That was a very important piece of evidence. So that piece is gone as you're considering the new evidence on appeal. The new evidence that was presented at the post-conviction hearing is Dr. Franklin's testimony showing that these identifications were highly likely to be erroneous and at significant risk of being an error. Recall the only contemporaneous description that these witnesses were able to give of the shooter was that it was a black man, 28 years old, and a description of clothing and accessories. But there was no mention of long hair, of the thick mustache and beard that Mr. McCoy had, nothing. Just 28-year-old black man. That was it. Later on, Officer Ballard's testimony shows that later on he may have added things, but the contemporaneous description was that minimal. At the photo erase, nobody identified Mr. McCoy as the shooter. So you have these initial showings that there is no identification. And then after that, according to Graib, they are shown a colored picture of Mr. McCoy before the lineup the next day to be sure that they could identify him. I've been doing this a long time. I've never seen such blatant testimony regarding that sort of exposure. And so when you have this testimony, the jury should be able to hear from an eyewitness expert just how flawed these identifications are. This case had all of the impediments that the court talked about in Lerma. There was the partial disguise. The shooter had a hat on. There was the weapon focus. These witnesses gave a far better description of the weapons that they saw than of the shooter. There was the high stress. They didn't see the shooter until after their friend had been shot while they were held at gunpoint by Milligan. I mean, this was a stressful situation as you get. There were multiple perpetrators, and all of those things that Lerma talked about that the expert should have testified about were present. Counsel, was Lerma a post-conviction case? No. I mean, it sounds like you're making an argument to the jury, and is that where we are procedurally at this point? Lerma was a direct appeal case. You're correct. But the question on appeal here is, is this conclusive? So if you go back to Robinson and Coleman about what it means to be conclusive, whether there's a probability of a different result, whether or not it undermines the confidence in the verdict, whether it would view the evidence in a different light, my position is that this expert testimony unquestionably accomplishes what Robinson says a petitioner needs to accomplish in order to warrant a hearing. What significance, if any, do we attach to Milligan's change in testimony, his affidavit, which contradicts what he said at the trial? Absolutely. That speaks to the second and the third of the errors, the manifest errors that occurred. Milligan has named – he has admitted at great risk to himself he could now be prosecuted for perjury. He could subject himself to civil ramifications for admitting to shooting Collins. At risk to himself, he has admitted that he was the perpetrator in this crime and that he committed this crime with someone who looked an awful lot like Mr. McCoy. Now, that goes to, you know, the way in which the court viewed that evidence was erroneous. It viewed it subjectively instead of objectively, and it siloed the evidence, and it didn't consider Dr. Franklin's testimony about why – how eyewitnesses work and why there was likely an error made when they thought it was McCoy. There was likely an error made when the witnesses centered on a height difference, which was what the court used to reject Milligan's testimony. So Milligan's testimony absolutely is part of this. By no means am I abandoning the other arguments. These are all interrelated. Counsel, why do you say that the court viewed Milligan's testimony through a prism of subjective credibility and not how a subsequent jury may look at the testimony? What's – why do you conclude that the judge's conclusion was subjective? Well, the judge found that he didn't believe Milligan. And instead of asking this question about what the jury would do, I think that – Well, did he say that, or did he list a number of reasons why Milligan's testimony was incredible? He basically listed a number of reasons. Correct. Said, you know, this is incredible testimony based on the fact that, you know, it's not worth the paper it's written on. He said a number of things suggesting that he thinks that no reasonable jury would believe that testimony. So I'm trying to figure out why you say that it was clearly subjective to the judge. And going back to his decision, I think if you look at it, that he does use a subjective standard rather than an objective. But I think you can't – the issues are all interrelated. So the reason why the court was most troubled by Milligan's testimony was because there was a height difference between Howard Reed, the person that Milligan admitted he committed the crime with, and Mr. McCourt. Well, I think the court went beyond that. He said after decades of denying that he had anything to do with it and he wasn't even there or all of these things, he now comes forward with a completely different story. And essentially the court was saying nobody would believe that. Not saying I wouldn't believe it, but nobody would believe that. Well, and this brings us to how these issues are all related. If the jury were to not hear about the blood – so there's no blood on Mr. McCourt's shoes. If the jury were to hear about how troubling these witness identifications were, and then the jury would hear Milligan's testimony. Before you get to that, though, doesn't the trial court have to make a credibility finding that at some point in order for it to advance? Doesn't the court have to do that? It does, but it needs to do that viewing the evidence collectively. And so that's, you know, that's where what I'd really like to focus on is Dr. Franklin's testimony, because I think when you credit Dr. Franklin's testimony, which there were no credibility problems with, and when you look at what that means for this trial and the utter lack of inculpatory evidence that's left, that's the prism we should be using when we look at Milligan's testimony. And that's the court's real error, is not looking at the evidence collectively and not looking at what Dr. Franklin's testimony means to this case. I'm sorry, did you have a question? No, I said thank you. Okay, sorry. So when you look at Dr. Franklin's testimony, you know, first of all, she could have talked about all of these things that we talked about in LERMA, about all these serious impediments. And then the new one that she adds that LERMA doesn't talk as much about but that's really relevant here is the extreme post-event information that happened here, the memory source error. This was a collaborative effort by these witnesses. And when you look at the individual identifications that they were made, they're really troubling. You have Hassan, who was in the cooler the entire time with the door shut. He admits he never saw anyone. He identified Mr. McCoy at the trial. He said that he identified him in the lineup as the shooter. And it's so insidious that the appellate court, if you look at the appellate court paragraph 4, the appellate court adopts this and says that all three witnesses identified Mr. McCoy as the shooter, even though Hassan didn't see it at all. The second identification is Awad. Well, he was interpreting for Hassan and for Ghraib's procedures the entire time before he ever made anything. And you have Ghraib, who failed to make any identification at the black and white photo array. And then you're still left with the fact that Ghraib says that all three of these witnesses were shown a color photo before the lineup to be sure that they were able to make a lineup identification. And what Dr. Franklin tells us is that when you see somebody, you see, you decide as a group that somebody committed the crime. And then you see the police show you that picture in the black and white photo array. You're not so sure. They show you, again, in the color Polaroid. Okay, that face is starting to ring a bell. You then get to the lineup. There's only one face that rings a bell in that lineup that's familiar to those witnesses. But we have what's called a memory source error. We don't know where it's familiar from because the way that memory works, according to Dr. Franklin, is that our brain tries to reconstruct what happens. And so when you've seen somebody again and again, that person becomes who you believe happened and that that contributes to numerous wrongful convictions. And Dr. Franklin, she's citing science from all over the place. This is not contested science. This is stuff she's citing military studies. She's citing, you know, all of the experts in the field studies on this issue. And there's a reason why misidentification is the leading cause of wrongful conviction. It's because how we logically think that our brain works is different than the way in which our brain actually works when we're trying to understand what happened. When we're in a stressful situation, face violence, and we're trying to recreate for our brains what happened. And her testimony is really strong. She's talking about how the initial non-identifications of the black and white array are diagnostic of innocence, the fact that nobody was able to identify them there. She talks about, you know, the extreme risk of this being inaccurate, the high unreliability here. And the jury never heard from an expert, from the eyewitness expert. To understand the conclusiveness, I think if we look at other types of cases where the science has changed, this issue is a lot clearer. So if you can imagine, for instance, a case where the only evidence of guilt was microscopic hair comparison or faulty arson science. Or I've had a case in another jurisdiction where it was a dog sniff lineup. And modern science tells us these are no longer scientifically sound bases to support a conviction. Those defendants should get a new trial on post-conviction if they say the only evidence that supported my conviction was this evidence that modern science is telling us is deeply troubling. And that is the case. That is where we are at with eyewitness identification. It has similarly universally been found to have impediments to accuracy. And because of those impediments to accuracy, the jury should get to hear that. The jury should have the opportunity to hear how troubling that evidence is when it is the only evidence in a case, which is what the case is here. Excuse me. So at the risk of... There's an example that I think might illustrate how it is this memory source error that Dr. Franklin tells us about. If we could imagine if a group of gunmen were to come into the courtroom right now and hold us all at gunpoint, it's terrifying, people are screaming, and I get shot. But nobody sees the person who shot me until after I've been shot, and that person then flees the courtroom. What Dr. Franklin tells us, the science says, is we might have a hazy, or you might, I'm dead, you might have a hazy idea of who it is that shot me. But if two of your colleagues were to say, hey, I think it was that woman from the first argument who was sitting in the front corner there, well, then our memories start to reconstruct itself. And you start to say, hey, you know what, the shooter, she did kind of look like that person. And then if you get a photo array, and the only face that you recognize is that woman from the first argument, it's starting to plant in your brain that that's the possibility, that that's who it probably was. And then if the police show you a colored photo before the lineup, and they, you know, to be sure you're able to do something in the lineup, by the time you get to the lineup, the only face that screams out at you that is familiar is the face of the woman from the first argument who was sitting in the front corner. But we have a memory source error. Our brain is reconstructing the crime to see it in light of that new information that we've received, this post-event information, and we have an unconscious transference. And that's what the science tells us, is that we unconsciously start to believe that. And there's no malice on the part of the witnesses. There's no misdeed or intent to defraud on the part of the witnesses. This is how our brains operate. And Dr. Franklin talks about a military study, a really interesting one, where people are interrogated in the context of a high-stress situation. And then, you know, these are like 40-minute interrogations. And afterwards, when they're called upon to try and recall their interrogator, especially if there's something, some suggestion, if they're shown a picture or they're given a description or they're given something that indicates that, that misleads them as to who that person is, the inaccuracy rates are alarming. They are, you know, as Dr. Franklin says, very high likely of being inaccurate. And this is no different than the other. I know. I hate to interrupt, but can I ask you something?  What's the significance of the photo being colored as opposed to black and white? Well, the significance is in how we unwind this, the factual pattern. So the witnesses are shown a black and white photo array. And the officer conducting it says nobody identifies Mr. McCoy as the shooter during that array. Hassan identifies McCoy during the black and white arrays having been in the store earlier. But nobody identifies that. But then, Graib's testimony is that they are shown a colored photo afterwards. They showed us pictures. This is the record at 39. They showed us pictures because they wanted to be sure. When they brought the person and showed us the lineup, and at the same moment they asked us whether we could identify him, and they showed us black and white pictures, and they showed us some colored pictures after. So there is no colored photo array that the officers testify. There's no colored photo array in the lineup. He says they show him a colored picture after to be sure he can identify someone in the lineup. And we know he's not talking about Milligan's, because Milligan had a colored photo array that was before Mr. McCoy's. And Milligan's lineup doesn't happen for two weeks later. He's talking about McCoy's lineup, and he is saying that he was shown a colored picture in advance of the lineup. That is, you know, deeply suggestive. So that's the significance of the color versus the black and white in this case. But either way, what Dr. Franklin is telling us is that the memory source error happens when you have this post-event exposure effect, you know, that really when you're doing some kind of identification procedure, you should just do one. She testifies you shouldn't do a photo array and then a lineup and then, you know, another lineup, because at some point the exposure, the seeing that person as the only familiar face, becomes a self-fulfilling prophecy. That's the only face that jumps out at you, and that's how misidentification happens. And that's why eyewitness identification has more wrongful convictions than all of the other sources put together, because this is how our brains operate. And so a jury should have heard about this expert testimony. There is no other inculpatory evidence in this case, and it's really troubling to have a conviction that relies on something where science, modern science is now telling us it is faulty evidence. So like I was saying earlier, I stand by all the other issues. I think they are all interrelated. I think they all are mutually supportive. But Mr. McCoy met his burden to prove conclusiveness, and so a new trial is warranted. Thank you, counsel. Thank you. Good morning, and are you prepared to proceed? Yes, Your Honor. Good morning. I'm going to introduce the court, counsel. I'm Assistant Attorney General Michael Cibula on behalf of the people of the State of Illinois. Your Honor, the lower court's got this exactly right. Petitioner's actual innocence claim is meritless because the evidence he relies on is not new. It's cumulative evidence presented at trial, and most importantly, it fails to show that a jury would reach a different conclusion. Now, I've argued a lot of actual innocence cases in my career, and normally I would start with, well, what's the evidence that Petitioner is presenting to show that they're innocent? Because that's really the whole point of the proceeding. But Petitioner in his reply brief and today really argued a lot of trial evidence, and in doing so said things that were incorrect, and I'd like to briefly touch on them because a lot of them really deal with sort of what the eyewitnesses saw in the line of procedures, and there were questions about colored photographs that I think are inconsistent with the record and are also inconsistent with what Petitioner's counsel told the circuit court during the third stage evidentiary hearing. So counsel has argued or Petitioner has argued in his briefing today that these eyewitnesses failed to identify the shooter. Well, to be clear, it's undisputed that all of the eyewitnesses identified Petitioner in a live lineup. They also all identified him in court. Now, counsel has focused on this black and white photo array as part of their argument and said that none of them identified Petitioner in black and white photo array. In the circuit court during the third stage evidentiary hearing on Supplemental Report of Proceedings, I believe, 10, 291, and 302, counsel said actually the correct statement at that time. She said some of them were shown in the photo array and some of them were not. Some of them made identifications. Some did not. So what does the record actually show? A lot, the record is clear, did not see the black and white photo array. That's page R176. Police officer in charge of the lineup said the day we were doing lineups, we couldn't locate him, so we didn't show him in the black and white photo array. Counsel has tried to argue that he translated for some of these witnesses. He translated initially when they were speaking with police at the scene of the crime, but the record is very clear that when they were viewing lineups, a lot did not translate for them. The witnesses were very clear. We viewed lineups, whether it was the live lineup or the black and white photographs, separately. And, again, on page 291 of the supplemental report proceedings, Petitioner's counsel said at the third stage after her entry, a lot was not shown in this photo array. The next is Hassan, R180. The record is clear. Hassan identified Petitioner in the black and white photo array. Grave, I believe is how you pronounce his name. Grave was shown in the black and white photo array, and on pages, I believe, 41 and 42 of the record, Grave testified, when I saw that black and white photo array, I recognized him. Now, the police officer who administered the photo array said, well, Grave asked for a color photograph, but he said we did not have color photographs of Petitioner. So what the trial testimony was, was Grave saying, I saw the black and white, and I recognized him, and the police officer saying he asked to see a color photograph, which we did not have. So when counsel argues that none of these eyewitnesses, that all of these eyewitnesses were shown in the photo array and they all failed to identify Petitioner, that's incorrect. Now, on the issue of this color photograph, a question was asked, and it's the question I had, what would be wrong about showing these witnesses a color photograph? And counsel has never really been able to fully answer that. But the more important issue with the color photograph is the idea is that these witnesses were somehow improperly influenced by police by showing them in the photo array. There's two obvious problems with that. First is that if there were problems with the lineups, that's an argument you raised 40 years ago. You don't wait until your fourth post-conviction petition 40 years later and say, I think they didn't follow proper lineup procedures. So it's obviously procedurally barred. But more importantly, there's no factual basis for this. The witnesses were shown color photographs of Milligan, the accomplice. Please understand, we did not have color photographs of Petitioner. And I'm surprised to see the arguments about color photographs in the reply we've written today, because if you look at supplemental court proceeding page 43, this is testimony at the third stage evidentiary. This is testimony from Petitioner's eyewitness experts, the person they retained to examine the record, figure out can we rely on these eyewitnesses. And she said, this is her testimony, my understanding in reviewing the case over the past week is that none of the eyewitnesses reviewed any color photos involving Mr. Franklin. She talks about a report and she said she had mentioned in a report inaccurately that they viewed color photographs of Mr. McCoy, Petitioner, and I think those need to be corrected. So when counsel talks about these color photo arrays in their reply brief and today and how that somehow influenced, not only is it barred, not only is it inconsistent with the record, which shows that they were not shown photo arrays, it's inconsistent with what their own expert testified to at the third stage evidentiary. Counsel has also argued today in the reply brief that these eyewitnesses made very generic descriptions of the shooter and they only came out after a lot of time had passed and they collaborated together and they've been influenced by police and photographs. It's not what the record shows. What the record shows is that within about 20 minutes of the shooting, a police officer arrived at the crime scene. Now, as your honors can understand, the officer testified he was trying to do a bunch of things at once. He's trying to secure the crime scene. He's trying to get basic descriptions of multiple perpetrators so he can get them out on the radar. So he's very clear. I'm not trying to get a comprehensive description. And as to the shooter, they said that the shooter was a black male, which Petitioner is. They said he was 5'9", which is his exact height. They said that he was about 28. Petitioner was 24. They said he had a gold earring, which Petitioner did. They said he had a long black jacket, a black hat, blue jeans, and gym shoes, which is exactly what Petitioner was wearing a couple days later. Later that night, they were then interviewed by the lead detective, who obviously had more time, and they told him that the shooter was a black male between the age of 25 to 30, 5'8", or so, 160 to 190 pounds, which Petitioner is. They mentioned the gold earring in his left ear. They mentioned he had facial hair, which Petitioner had, and they can describe as clothing. So the record shows that the night of the shooting, before they could have been influenced, before there was any kind of collateral procedure, they gave very detailed descriptions that closely matched Petitioner. Now, as to the evidence Petitioner actually relies on, which I think as the appellate court said, this case Petitioner has presented three witnesses, Milligan, his accomplice, a forensic scientist, and the eyewitness expert. The appellate court correctly said this case really rises and falls for the most part on Milligan. So it's kind of surprising to see counsel basically not want to discuss Milligan at all. But maybe it's not surprising, because as the circuit court said, he's obviously not credible. He's inherently not credible because everyone agrees he's a convicted violent offender who has previously committed perjury. So he not only has a history of violent offenses, he has a history of violent growth. As Your Honor has acknowledged, I won't belabor this point, he's obviously completely changed his story, and he changed it decades later, only after he admittedly spoke to Petitioner in prison. That kind of change is inherently not credible. This court reached a similar conclusion in People v. Reed, where it's found an accomplice's testimony that the Petitioner was innocent was not credible, because he came forward only years after the offense, after he spoke to the Petitioner in prison, which is exactly what happened here. I won't belabor the point on Milligan, Your Honor. Everything the court said was correct. He dramatically changed his story. He's obviously incorrect about a number of different things. The other witnesses they rely on are the forensic expert and the eyewitness expert. As to the forensic expert, unfortunately, I have to correct Petitioner's argument again. Petitioner has argued, and I don't understand why, but has repeatedly argued, openly, briefly, plaudibly, and today, that this forensic expert definitively proved that there was no blood on Shue. That is incorrect. What the forensic expert testified is there was a substance on Petitioner's shoe. A preliminary test was conducted. That preliminary test shows that that substance is possibly blood, but there is not enough sample on the shoe to conduct further tests to kind of prove beyond all doubt that it is blood. So as the circuit court said, well, that's the same thing that the space expert said in trial back in 1989. So it's obviously not new. It's cumulative evidence. But more importantly, it doesn't show that Petitioner is innocent. It doesn't corroborate Milligan in any way. If you tell the jury there is a substance on Petitioner's shoe and it's possibly blood, that suggests he's guilty. One last point on the blood issue, which, again, I apologize. I need to correct Petitioner again. Petitioner argued that the blood was the centerpiece of the trial and that the prosecution hammered this blood issue. Obviously, the key issue at trial was these eyewitnesses. That's what they focused on. And as to closing argument, the prosecution conceded, like, look, we can't prove that this is human blood. It's reasonable to assume it is based on this information. But we can't definitively prove it is. And they've raised this claim on direct appeal 30 or 40 years ago. And they lost for that reason because the appellate court pointed out the prosecution was careful to note that we can't definitively say this is human blood, let alone that it was Petitioner's blood. In terms of the eyewitness expert, Your Honor, again, she doesn't support this actual innocence claim. We've presented a number of reasons why that is in terms of it's not really new testimony. It's cumulative. And she's wrong about certain issues. But again, the court doesn't even need to get into that issue because it already found that this same expert's testimony was insufficient in a similar case. That's People v. Pronte, Your Honors. In People v. Pronte, similar to this case, Dr. Franklin, the same expert, testified that we shouldn't really trust these stage witnesses because the limits of human memory and they were influenced by sort of events that occurred after the murder. So similar arguments were made here. And this court said, well, at most, that's impeachment evidence. And impeachment evidence is not enough to support an actual innocence claim. And for that reason and the reasons we outlined in our brief, Franklin doesn't support an actual innocence claim in this case either. Counsel, just a couple of foundational questions. So do you agree that the standard of review is manifest error? Yes, Your Honor. We've always said that. That's beyond settled. So petitioner attempted to argue in their opening brief that this court should review it de novo. We pointed out under settled law it's incorrect. And my understanding, based on the reply brief and today, that they admit that they were wrong about that in their opening brief. So it's absolutely manifest error that's long settled. Is conclusiveness the only issue as it relates to the standard for whether or not we would send this back? No, Your Honor. You believe some of the evidence is cumulative? We've argued. So as to Milligan, we admit Milligan is new. He's completely changed. He's obviously new. But, for example, the forensic scientists, we've argued extensively and we believe the circuit court found that's not new evidence because she, by her own admission, was testifying about information that was available back in 1986. So it's before trial. So, yes, the standard is it has to be new, non-cumulative evidence that would show the result of trial different. For Milligan, yes, it's new, it's non-cumulative. But for the others, we've raised arguments, and I won't belabor them here, but we've raised arguments. I think especially the forensic scientists, it's beyond clear that she's not new, she's not non-cumulative. So the court would have to resolve those issues for those two witnesses as well. And what's your position as far as how the evidence was looked at? Did the trial court do that wrong? There were zero procedural problems for the reasons we've explained in our brief. And I think this Court's decision in Coleman is really helpful to kind of outlining what courts should do at the third stage hearing. Coleman was a case where it was a post-conviction actual innocence claim where the petitioner presented eight witnesses. And this Court said the very first thing you should do when you reach that third stage hearing is go through each witness individually and ask for each witness. This is paragraph 97. Each witness, is this witness new? Is this witness non-cumulative? And if the witness doesn't pass that barrier, you toss them out. So, for example, in Coleman there were eight witnesses. This Court found three of them were not new, they were cumulative, so it only considered five on the conclusiveness. Now, petitioner has kind of faulted the circuit court for kind of going through these witnesses one by one. We all agree you have to consider the evidence collectively. If it meets the new and non-cumulative, you have to consider it. Yeah, obviously. The Court did this, as we've explained. But saying you have to review or consider the evidence collectively doesn't mean you consider witnesses simultaneously. These are three witnesses that are talking about three different things. You have an accomplice who is recanting his testimony. You have a forensic scientist who's talking about blood evidence. And you have a non-witness expert who's talking about sort of general comments about the science of eyewitness testimony. And for each of them, obviously, you're going to have to kind of go one by one to say what the strengths and weaknesses are. You can't discuss them simultaneously. But just because you go one by one doesn't mean you're not considering them collectively. Obviously, as Your Honor knows, we assume judges know and follow the law, unless it's been proven differently. Here, the judge literally said, in considering all of the evidence, I find you failed to show that the result of trial would be different. And that wasn't just something he tossed off. He clearly went through all of the witnesses and explained specifically why they didn't meet the standard. So there are absolutely no procedural errors in this case. And so the appellate court, though, disagreed with what you're saying. The appellate court determined that the trial court did err. So the appellate court got it wrong. Yeah. The appellate court, yeah, we disagree with that, Your Honor, for the reasons I mentioned today. The court, as I said, it's unclear to me what the court should have done, the cert court should have done, unless we imposed some kind of magic words test, which obviously this Court's not going to do. I don't know what Petitioner wants the cert court to do or the appellate court, unless it's literally to say, I don't think witness A corroborates witness B, and making the judge expressly say that. But it's implicit in everything he says. When he says the forensic scientist does not undermine the state's case, the forensic scientist actually corroborates the state's case, it's pretty clear he's saying, well, then the forensic scientist doesn't support Milligan's new change story. But again, saying that you have to discuss evidence collectively and consider it collectively, it doesn't mean you have to discuss it simultaneously, because it's just impossible. These are witnesses that are talking about different subjects. They have different strengths and weaknesses to their testimony. The court needs to kind of go one by one. And so I think, you know, obviously one of the things this Court has to do is, when it's writing an opinion, is what are we going to tell the lower courts to do? And I don't know what you would tell this Court, what you would tell the lower courts that the cert court did wrong here procedurally, unless you're going to impose some kind of magic words test and say they need to literally say, this witness does not corroborate this witness, which I think I don't need to explain to this Court why that would be a terrible idea. So unless there are any other questions, we ask this Court to confirm the lower court's judgment. Thank you. Some brief rebuttal. I'll start where the state left off, which is what you should tell the lower courts to do. What lower courts need to hear is that the conclusiveness of an actual innocence claim can be proven by disproving the entirety of the prosecution. Now, when the state stands up and says, what is wrong with showing a witness a colored photo picture before the lineup, they are ignoring all of the new evidence from Dr. Franklin, talking about how our memory works and why this science is so important. These identifications have major flaws that the Court has been acknowledging since Lerma, and there has been no scientific testimony to help the jury to understand why those identifications are so troubling. Just a few, we've been going back and forth on the facts here. I want to make it very clear. No one identified Mr. McCoy at the photo array as the shooter. This is a record at 181. O'Connell, who was the officer who conducted the array, was asked, did anyone identify Mr. Michael McCoy in the black and white photo spread as having been the shooter? And he says, nobody identified him as being the shooter. So there was no such identification, and the fact that the state's trying to rely on the blood is deeply, deeply troubling here. There is an Illinois State Police lab report, this is the record at CI-2226, where they found no blood indicated. And expert Langford is specifically asked, this is record at 249, was any blood ever confirmed? No, it was not. Would an expert be able to testify that there was blood on Mr. McCoy's shoes? Answer, they would not. There is no blood evidence that has been proven. So the fact that there's some question, you know, I spilled on my jacket this morning. It might be blood, but it might be coffee and orange juice. But if there's no testing that says that I have blood on my jacket, you cannot present in a new trial that I have blood on my jacket. That's where we're at with the blood evidence. There is no blood evidence that the state could present. All they have are these eyewitness identifications, and I, you know, really carefully in my reply go through the sleight of hand that the state is doing on the facts. For counsel to get up and say that the witness descriptions were great, please look at Officer Ballard's testimony. He testifies that his ultimate description, the one with the weight and the height and all of that, comes from a collaborative effort. And he's combining from all of his police reports, and most importantly, it's from later. He can't tell you when. He doesn't record timing. The only thing he remembers the witnesses saying at first is 28-year-old black man with an earring and a leather jacket. I was around in the 80s. You know, it wasn't a pretty fashion time. We were all wearing leather jackets and earrings. This is very common. This is nothing about Mr. McCoy's actual facial features, the fact that he had a beard and a heavy mustache and long hair. So please look at Officer Ballard's testimony. This was not a case where there was a great witness description, and this is not a case where there is blood evidence. This is an eyewitness case where the eyewitness's identification testimony is terrible, and they never heard from an expert who would have explained why it is troubling and why science, modern science, has told us that this evidence is no longer reliable. Counsel's citation to Pronte is really important because Pronte is a case where this court looked at the bite mark evidence and said, you know what, it's true that bite mark science is no longer good, but we have other evidence to support this condition. And so, you know, you're not going to get over the hurdle here. This is a case where there is no other evidence. There has been a scientific debunking of the only evidence that exists, and there is no other evidence. And without that other evidence, that's enough to meet the conclusiveness standard. A jury should hear that there is no forensic connection and that these identifications are really, really troubling. I do want to address the concern that you raised about whether or not this evidence is new. Dr. Franklin's testimony absolutely is new. This type of testimony was found new in Lerma back in 2016, and Lerma talks about how things have changed since the time of Enos. In this case, this trial happened pre-Enos even. The only cases that the state could find of experts being allowed to put on this kind of testimony were from other parts of the country. They could not find a single case in Illinois where expert testimony was allowed at that time. It is new information, and for whatever reason, it feels counterintuitive and we're all a little resistant to it. It doesn't feel as clear or as easy as the new arson science or bite marks or microscopic hair. But there is no reason why it should be treated any differently. We have science that is sort of being universally accepted that is decades in the making that says that this is a troubling form of evidence, that there are problems with it, there are very specific problems, and it outlines at least a half dozen that are present in this case and that a jury never heard about. I do want to address Milligan because everybody is pointing out that I'm talking less about Milligan. I think that that issue, frankly, is a little bit easier. The appellate court found that there was a siloed approach, and to me, that warrants a remand for a new evidentiary hearing. The appellate court was very clear on that siloed approach, and I do think that the problem, the real problem with the siloing of Milligan is that you didn't consider Dr. Franklin's testimony with him. This eyewitness science is really important stuff in how we understand what happens initially in that first moment versus what happens later after we've had a chance to talk about it and decide, oh, it was probably this person. And so after you make that decision, that's when things like the height comes in and the weight comes in because you're imagining, you're unconsciously transferring your memory of what happened with that person. So any height discrepancy between what they were saying the offender was and Howard Reed, who Milligan says was the offender, any height discrepancy between them has to be understood by looking at Dr. Franklin's testimony about why the witnesses thought that the shooter was McCoy's height and not Reed's height. And so it all comes back to ignoring this modern science that, in my mind, is super important. I do want to talk, just to return, to the state talking about that it wasn't the centerpiece of their case. I want to really quickly just highlight the state's closing argument and just how heavily they argued the blood. This is the record at 337. They argued the blood that fell on the floor and on the walls that had gotten on his shoes of the man who shot the victim. Record 336, you saw the shoes in court and you'll have them with you back in the jury room. What did they have on them? They had blood. 371, the blood on the gym shoes. It just so happens you have blood on your gym shoes. Come on, how do you get blood on your gym shoes? 378, it's the bloody shoes of the defendant. So the state absolutely, this case had two pieces to it. It had blood on the shoes and the modern science tells us there's no way in a new trial they could claim he had blood on his shoes. And it had the eyewitness identification. And the modern science tells us there are all these things that are counterintuitive to us that make these identifications particularly troubling. You can't be showing witnesses pictures to help support them in their lineup identification. That creates the exposure effect. Even if that didn't happen, by just doing the black and white array and showing those photographs and then having them do a lineup, that creates the exposure effect. The discussion that these witnesses were having, that creates the exposure effect. Coupled with, you know, the traditional ones that we see in LRMA, the disguise, the weapons focus, the stress, these are what are causing wrongful convictions. People don't understand just how impaired our memory is, how we reconstruct this stressful event, and just how often people get it wrong when they think they know that this is the person who did it. Nothing is more compelling than a witness pointing and saying, that's the man who did it. Juries believe that, and they are so often wrong. And it's incumbent in case where there is no other evidence supporting it that the jury should have heard this evidence. This is enough to meet the conclusiveness standard. Robinson is really clear. You don't have to prove total vindication. You have to cast the evidence in a light where what results of the trial would be different. And this absolutely meets the Robinson standard. The Robinson court specifically said, we specifically rejected the total vindication or exoneration standard. The conclusive element requires only that the petitioner present evidence that places the trial in a different light and undermines the court's confidence in the judgment of guilt. Dr. Franklin's testimony does that. You add in Milligan's testimony. Boy, does it do that. This is a case that warrants a new trial. Mr. McCoy has now served more than double the minimum sentence for a murder conviction. He deserves a new trial. He's met the conclusiveness standard. Thank you, counsel.  Case number 131565, People v. McCoy, is taken under advisement as agenda number six.